NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
ALEXANDER C.K. WYMAN (Cal. Bar No. 295339)
Assistant United States Attorney
Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2435
    Facsimile: (213) 894-6269
    E-mail:   alex.wyman@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>          v.<br><br>GASTON BROWN,<br>  aka "Kevin Brown,"<br>  aka "M.W.,"<br>  aka "J.B.,"<br><br>       Defendant. | No. CR 17-47(A)-CAS<br><br>GOVERNMENT'S SENTENCING POSITION; MEMORANDUM OF POINTS AND AUTHORITIES<br><br>Hearing Date: September 16, 2019<br>Hearing Time: 1:30 p.m.<br>Location:    Courtroom of the<br>          Hon. Christina A.<br>          Snyder |

    Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Alexander C.K. Wyman, hereby files its Sentencing Position.

//

//

//

//

//

1       This position is based upon the attached memorandum of points

2   and authorities, the Presentence Investigation Report, the files and

3   records in this case, and such further evidence and argument as the

4   Court may permit.

5   Dated: September 6, 2018      Respectfully submitted,

6                             NICOLA T. HANNA
                          United States Attorney

7

8                             BRANDON D. FOX
                          Assistant United States Attorney
                          Chief, Criminal Division

9

10                                    /s/
                          _____

11                            ALEXANDER C.K. WYMAN
                          Assistant United States Attorney

12                            Attorneys for Plaintiff
                          UNITED STATES OF AMERICA

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.   INTRODUCTION

3       Defendant GASTON BROWN ("defendant") paid a flight attendant
4  with JetBlue to carry a suitcase containing almost 27 kilograms of
5  cocaine through a TSA "known crewmember" ("KCM") checkpoint at Los
6  Angeles International Airport ("LAX").  Flight records and trial
7  testimony by the flight attendant, Marsha Gay Reynolds ("Reynolds"),
8  show that this was only one of many times defendant had paid Reynolds
9  to transport suitcases of drugs or drug money through KCM checkpoints
10 at LAX and JFK International Airport ("JFK").  In order to carry out
11 this drug conspiracy, defendant -- a Jamaican national in the United
12 States illegally -- stole the identities of two mentally disabled men
13 (M.W. and J.B.) and used them to travel across the country with
14 Reynolds and the drugs or drug money he had given her.

15      For these actions, defendant was charged and convicted at trial
16 of conspiracy to distribute cocaine, possession with intent to
17 distribute cocaine, unlawful transfer, possession, or use of a means
18 of identification in furtherance of a drug trafficking crime, use of
19 a counterfeit access device, and aggravated identity theft.
20 Following a four-day trial in February 2018, a jury found defendant
21 guilty on all counts.  Defendant now faces sentencing with a
22 mandatory minimum sentence of 12 years -- 10 years for the drug
23 conspiracy and possession counts and two years for the aggravated
24 identity theft count -- and a Guidelines range of 30 years to life.

25      Defendant deserves a significant custodial sentence.  His crimes
26 ranged from drug trafficking in high quantities of cocaine (almost 27
27 kilograms in one trip) to identity theft with vulnerable victims.
28 Further, his Guidelines range reflects the fact that, with two prior

felony drug convictions, defendant constitutes a career offender under the United States Sentencing Guidelines ("Guidelines" or "USSG"). Even without the "career offender" status, however, defendant would be in criminal history category IV and face a Guidelines range of 168 to 210 months, in addition to the two-year mandatory consecutive sentence for aggravated identity theft. A sentence in this range would be insufficient to reflect defendant's troubling -- and escalating -- history in drug trafficking. Nevertheless, a sentence of 30 years is likely higher than necessary to address defendant's crimes. Accordingly, in concurrence with the recommendation of the United States Probation and Pretrial Services Office ("USPO"), the government recommends that the Court impose a sentence of 20 years' imprisonment, which is a downward variance. A sentence of 20 years is sufficient, but not greater than necessary, to achieve the sentencing goals of 18 U.S.C. § 3553(a).

## II.  STATEMENT OF FACTS

Beginning on an unknown date, and continuing until March 18, 2016, defendant orchestrated a conspiracy involving JetBlue flight attendant Marsha Gay Reynolds to transport cocaine and drug money across the country. (PSR ¶ 10.)[1] Defendant would pay Reynolds to carry suitcases for him through KCM checkpoints at both LAX and JFK, knowing that flight attendants like Reynolds are subjected to much lighter screening at these checkpoints and that she would be able to carry his drugs and drug money through the checkpoints without being stopped. (PSR ¶¶ 10, 14-15.) On dates that he would arrange with

---

[1] "PSR" refers to the Presentence Investigation Report, and "Recommendation Letter" refers to the USPO's sentencing recommendation letter to the Court, both disclosed on July 17, 2018. (Dkts. 173-74.)

1    Reynolds, defendant would bring a suitcase with drugs or drug money
2    to the airport, give the suitcase to Reynolds to walk through the KCM
3    checkpoint, and then meet Reynolds in the "sterile" area of the
4    airport (past security) to retake possession of the suitcase.  (PSR
5    ¶¶ 14-15.)  Not trusting the drugs or drug money to anyone else,
6    defendant would travel with the suitcase himself between LAX and JFK.
7         To do so, however, defendant needed a new identity.  Defendant
8    was in the United States illegally and had, after serving a four-year
9    sentence for his prior drug crimes, been deported from the United
10   States in 2006.  (PSR ¶ 82.)  Because he could not use his own
11   identity, he stole the identities of two other people who he knew
12   were unlikely to travel on cross-country flights as he planned to do.
13   Specifically, he stole the identities of two mentally disabled men
14   from the same mental health facility in Massachusetts.  (PSR ¶¶ 11-13
15   & n.1.)  Using these identities, and primarily the identity of M.W.,
16   defendant traveled across the country and back and forth to Jamaica
17   to further his drug-trafficking activities.  (Id.)  This included
18   acquiring driver's licenses, passports, credit cards, airline
19   tickets, and rental cars in the names of those individuals.  (Id.)
20        Defendant's conspiracy was uncovered on March 18, 2016 after
21   Reynolds was randomly selected for secondary screening at LAX and
22   abandoned the suitcase defendant had given her.  Upon inspection,
23   authorities discovered that the suitcase had approximately 26.94
24   kilograms of cocaine inside.  (PSR ¶¶ 17-19.)  Five days later,
25   defendant, using a passport he had acquired in the name of J.B., fled
26   the country for Jamaica.  (PSR ¶ 20.)  He then returned on April 16,
27   2016, on a boat with several other undocumented immigrants,
28   undoubtedly under the impression that law enforcement would be

1    looking for him under either his name of the names of the mentally
2    disabled men whose identities he had stolen.  (PSR ¶ 71.)

3        Once the government started investigating defendant and
4    Reynolds, it became clear, both from defendant's frequent cross-
5    country trips with Reynolds under the name M.W. and from Reynolds's
6    testimony, that the March 18, 2016 trip was far from exceptional.  To
7    the contrary, between October 2015 and March 2016, Reynolds smuggled
8    drugs or drug proceeds through KCM checkpoints at defendant's
9    direction at least <u>six</u> times.  (PSR ¶ 16.)

10        For these crimes, defendant was charged with one count of
11   conspiracy to distribute and possess with intent to distribute
12   cocaine, in violation of 21 U.S.C. § 846, one count of possession
13   with intent to distribute cocaine, in violation of 21 U.S.C.
14   § 841(a)(1), (b)(1)(a)(ii), one count of using a means of
15   identification in furtherance of a drug trafficking crime, in
16   violation of 18 U.S.C. § 1028(a)(7), one count of using a counterfeit
17   access device, in violation of 18 U.S.C. § 1028(a)(1), and one count
18   of aggravated identity theft, in violation of 18 U.S.C.
19   § 1028A(a)(1).  (<u>See</u> FSI (Dkt. 87).)  Following a four-day trial on
20   these charges, a jury found defendant guilty on all counts on
21   February 16, 2018.  (Dkt. 162.)  He now faces sentencing.

22   **III. THE PSR CORRECTLY CALCULATED DEFENDANT'S GUIDELINES RANGE**

23        The PSR calculated defendant's base offense level as 32 under
24   USSG Sections 2D1.1(a)(5) and 2D1.1(c)(4), since the drug crimes
25   involved between 15 and 50 kilograms of cocaine.  (PSR ¶¶ 34-35.)
26   The PSR found that no specific offense characteristics or adjustments
27   should apply, and that the identity theft crimes, grouped separately,
28   did not add to his offense level.  (PSR ¶ 53.)

4

The PSR then detailed defendant's criminal history, which includes felony convictions for: (1) possession of marijuana for sale in 2001 (PSR ¶ 69); (2) possession of marijuana for sale in 2002 (PSR ¶ 70); and (3) illegal reentry in 2016 (PSR ¶ 71).  These convictions resulted in a total criminal history score of 8 and therefore a criminal history category of IV.  (PSR ¶¶ 72-73.)  Had that been the end of the story, defendant's Guidelines range, based on criminal history category IV and offense level 32, would be 168 to 210 months. Because defendant is a repeat drug offender, however, with this crime constituting his third controlled substance offense under the Guidelines, the PSR correctly determined that defendant constitutes a "career offender" under USSG § 4B1.1.  (PSR ¶¶ 57-59.)  As a result, defendant's offense level is 37, his criminal history category is VI, and his Guidelines range is 30 years to life.  (PSR ¶ 59.)

A year after the PSR was disclosed, defendant filed objections to the PSR, arguing that his two criminal drug convictions from 2001 and 2002 should not be counted in determining his criminal history, that he is eligible for the "safety valve" provision, and that he should be considered a "minimal participant" in the conspiracy that he orchestrated.  (Dkt. 205.)  Defendant cites no cases in support of these arguments, although he submits two exhibits purporting to show that his state convictions have been "set aside."  (Id. at 3, Exs. A-B.)  Indeed, these one-page exhibits appear to show that the Superior Court of Arizona, Maricopa County, set aside the judgments from defendant's state drug convictions.  (Id. Exs. A-B.)  One of these orders also restores defendant's civil rights that were lost or suspended as a result of the conviction.  (Id. Ex. B.)  These orders, however, have no impact on the federal Guidelines.  Section 4A1.2 of

1   the Guidelines -- the provision governing criminal history

2   calculations -- specifically addresses orders of this nature and

3   states unequivocally that they have no effect on a defendant's

4   criminal history calculation:

> **Convictions Set Aside or Defendant Pardoned.** -- A number of
> jurisdictions have various procedures pursuant to which
> previous convictions may be set aside or the defendant may
> be pardoned for reasons unrelated to innocence or errors of
> law, _e.g._, in order to restore civil rights or to remove
> the stigma associated with a criminal conviction.
> <u>Sentences resulting from such convictions are to be
> counted</u>.

10  USSG § 4A1.2 application note 10 (emphasis added).  As a result,

11  defendant qualifies as a career offender and does not qualify for the

12  safety valve provision.  Defendant also does not qualify as a

13  "minimal participant"; to the contrary, defendant orchestrated the

14  entire conspiracy with Reynolds and was clearly more culpable than

15  her.  (<u>See</u> PSR ¶ 15 (detailing how defendant would pay Reynolds to

16  smuggle drugs and drug proceeds for him as a courier); <u>cf.</u> USSG

17  § 3B1.2 application note 3(A) (explaining that drug <u>couriers</u>, like

18  Reynolds, are substantially less culpable than others in the

19  conspiracy who pay them to transport drugs, like defendant).)

20      Accordingly, defendant's objections to the PSR should be

21  overruled, and the Court should adopt the PSR's calculation of

22  defendant's offense level and criminal history category, resulting in

23  a Guidelines range of 30 years to life imprisonment, before

24  imposition of the two-year mandatory consecutive sentence on count

25  five for aggravated identity theft.

26  **IV.  THE COURT SHOULD IMPOSE A SENTENCE OF 20 YEARS' IMPRISONMENT**

27      Nothing less than a significant custodial sentence would

28  adequately achieve the sentencing goals of 18 U.S.C. § 3553(a).

First, defendant's crimes were extremely serious.  The quantity of cocaine that defendant had Reynolds smuggle for him on March 18, 2016 alone was substantial -- almost 27 kilograms in one suitcase.  That defendant had also paid Reynolds on at least six occasions over the previous five months alone to take similar trips suggests that the amount of cocaine he was transporting across the country was staggering.  Moreover, this was not a typical drug case; rather, defendant was using the identities of mentally disabled men whose identities he had stolen to further his drug trafficking crimes.  Such conduct is highly reprehensible and is a serious aggravating factor for this Court to consider.  As a result, a significant custodial sentence is necessary to reflect the seriousness of the offense.

Second, as noted by the USPO, defendant's "criminal history reflects an alarming pattern of drug offenses."  (Recommendation Letter at 6.)  Defendant, as a young man, had the opportunity to turn his life around after receiving two separate drug convictions and serving over four years in state prison.  He wasted this opportunity, continuing his drug trafficking activities until his arrest in this case.  That a four-year sentence was insufficient to deter defendant from his drug trafficking is troubling and suggests that a much more significant sentence is necessary to provide adequate deterrence and therefore to protect the public from further crimes by defendant. The sentence of 20 years' imprisonment recommended by both the government and the USPO, which would be "a significant incremental increase in punishment, is needed to promote [defendant's] respect for the law, protect the public from further crimes by [defendant],

1  and [] afford adequate deterrence to criminal conduct."

2  (Recommendation Letter at 6.)

3       Finally, only a significant custodial sentence would adequately

4  provide just punishment by avoiding sentencing disparities among

5  similarly situated criminal defendants.  See United States v. Goff,

6  501 F.3d 250, 258 (3d Cir. 2007) ("Part of 'just punishment' is the

7  avoidance of unwarranted sentencing disparities.").  Here, criminal

8  defendants who are "similarly situated" to defendant face a

9  Guidelines range of 30 years to life.  As a result, a sentence in

10 that range would properly avoid unwarranted sentencing disparities

11 and provide just punishment.  See United States v. Treadwell, 593

12 F.3d 990, 1011 (9th Cir. 2010) (court can rely on correctly

13 calculated Guidelines range to avoid unwarranted disparity).  Indeed,

14 many criminal defendants who are similarly situated to defendant --

15 that is, those who are facing their third conviction for a controlled

16 substance felony offense -- are also charged with an 851 information,

17 something that the government elected not to file in this case.

18      In short, many of the factors under 18 U.S.C. § 3553(a) counsel

19 in favor of a Guidelines sentence in this case, which would be 30

20 years to life imprisonment, before imposition of the mandatory

21 minimum two-year sentence for the aggravated identity theft

22 conviction in count five.  The government believes, however, that

23 such a sentence would be greater than necessary to address

24 defendant's conduct in this case.  Specifically, the government

25 concurs with the recommendation provided by the USPO, and is asking

26 this Court to vary downward by 12 years and impose a sentence of 20

27 years' imprisonment.  While the government believes that such a

28 variance is warranted in this case, any sentence below 20 years would

8

be inadequate to address the sentencing goals discussed above, particularly in light of defendant's prior drug convictions and the seriousness of the offense in this case.  Accordingly, the Court should impose a sentence of 20 years' imprisonment.

In addition to a 20-year custodial sentence, the mandatory minimum five-year period of supervised release is necessary in order to provide defendant with oversight and supervision as he attempts to become a law-abiding and contributing member of society following his release from imprisonment.  See United States v. Johnson, 529 U.S. 53, 59 (2000) ("Congress intended supervised release to assist individuals in their transition to community life."); S. Rep. No. 98-225, at 124 (1983) (describing the "primary goal" of supervised release as providing "rehabilitation").

## V.   CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court impose the following sentence: (1) 20 years' imprisonment; (2) the mandatory minimum five-year term of supervised release; and (3) a mandatory $100 special assessment.